UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ROBERT S. TAYLOR, JR.,

                       Petitioner,

       -against-

WILLIAM PHILLIPS, SUPERINTENDENT
GREEN HAVEN CORRECTIONAL
FACILITY,

                     Respondent.
-------------------------------------------------------X

**MEMORANDUM & ORDER**
05-CV-2596

**APPEARANCES:**

**For Petitioner:**
**MISCHEL & HORN, P.C.**
One Whitehall Street 10th Floor
New York, New York 10004
By:    Richard E. Mischel Esq.

**For Respondent:**
**Thomas J. Spota**
District Attorney of Suffolk County
Criminal Courts Building
200 Center Drive
Riverhead, New York 11901
By:    Guy Arcidiacono, Esq.

**HURLEY, Senior District Judge:**

      Robert S. Taylor ("petitioner" or "Taylor"), petitions this Court for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, vacating his judgment of conviction in

the Supreme Court, County of Suffolk for three counts of Murder in the Second

Degree. Taylor seeks relief on two grounds: ineffective assistance of trial counsel

and a violation of his due process rights in that the evidence was legally insufficient

to convict him of two counts of felony murder.[1] For the reasons set forth below, the petition is denied.

## BACKGROUND

On April 17, 1996, the bodies of Anthony Gunther ("Gunther") and Michael Raphael ("Raphael") were discovered in a parked car on Eades Street, in West Babylon, New York. The cause of death was multiple gunshot wounds. (Trial Transcript ("Tr.") 38-44, 221-25). Shortly thereafter the police received an anonymous tip that Gunther and Raphael were murdered in a garage at 43 Sprague Street in Amityville, New York "run by a man named Winston." The police then obtained and executed a search warrant of a dumpster outside of "Green's Collision," an auto body shop owned and operated by Sterling Green ("Green") and his father, Winston Green ("Winston"). (Tr. 315-328.)

Green was interviewed by Detective Gerald McAlvin of the Suffolk County Police Department on April 22, 1996. During this interview Green informed the police that he had an arrangement with a marijuana dealer named Mark "Mergie" Morant, whereby he accepted shipments of marijuana at the body shop in exchange for which Mergie paid him $1,000 per shipment. Mergie's associates would pick up the drugs shortly after each delivery. On April 17, 1996 he accepted and signed for a Federal Express delivery of marijuana and shortly thereafter Mergie's associate,

---

[1] Although the petition sets forth a third ground - that Taylor's statements should have been suppressed as involuntary (Pet. at p. 4) - that ground was withdrawn. (*See* Pet.'s Br. at 1).

Anthony Gunther, arrived at the body shop to pick up the drugs. Green claimed Gunther was followed into the shop by two black males who ordered Green to act as lookout. Green went to the front of a shop to speak with a customer, during which he heard "a lot of gunshots." When he returned to the back of the shop, he saw blood, but never saw a body. He cleaned up the shop and disposed of evidence because he feared for his safety and that of his family. Green's April 22 statement was memorialized in writing. (Tr. 329-371.)

Green was interviewed by the police a second time on May 5, 1996. He was advised of his *Miranda* rights but waived them. In an oral discussion and a written statement he changed his April 22 version of events. Green admitted to conspiring with "Sammy" and "Bobby" to rob the April 17, 1996 shipment of marijuana but insisted he only intended to steal the drugs. Green had Sammy call him early on the morning of April 17, 1996 at Pearl Green's house to wake him up so he (Green) would be the first person at the shop that day. He described both Sammy and Bobby as black Jamaican males; he believed that Bobby lived in Queens, and drove a beige, four door "Buick Regal or Somerset in the mid-eighties" with a damaged right fender that had "drill holes in it" and Sammy used to live in Wyandanch. (Tr. 372-403.)

Telephone records revealed that there was a phone call from a "Nadine Gale" in St. Albans, Queens to Pearl Green on April 17, 1996 at 6:59 a.m. Detective McAlvin learned from Gale's landlord that she had a boyfriend who lived with her named Gairy Chang ("Chang") and found a business card at Green's Collision that

said "Sammy's home" and listed Gale's phone number. The police record for Chang indicated two prior arrests in the Wyandanch area involving possession of marijuana. The police learned from Gale that Chang, known as Sammy, no longer lived with her but rather lived with his mother on Classon Avenue in Brooklyn. Phone records revealed a call from a phone registered to "G. Chang" at 842 Classon Avenue to Green's Collision on April 16, 1996, at 4:58 p.m. The police spoke with Chang's brother, Donovan, on May 7, 1996 and learned that Chang's best friend was Robert Taylor and that Taylor goes by the name "Bobby." The police also learned that Taylor lived on Sneider Avenue in Brooklyn and had a girlfriend who lived in a 20th floor apartment in the Ebbet's Field Housing Project. (Tr. 389-404.)

Taylor was arrested in Brooklyn on May 10, 1996 by Detective McAlvin and brought to police headquarters in Yaphank. Upon his arrest, he stated "I know what this is all about." Taylor had Chang's pager number in his possession when he was arrested. Also in his possession was a receipt from Western Beef dated April 17, 1996 at 1:58 p.m. The receipt listed several items including Ziploc bags. (Tr. at 466-68, 491-94.)

Taylor was advised of his *Miranda* rights in the police car; he waived his rights and agreed to speak with the detectives. While in the car, he told the detectives the following: "Sammy" was his cousin Gairy Chang; he had driven Sammy to the scene of the crime and had agreed to commit the robbery because his girlfriend, Jamelia Skyers, was pregnant; he had been hiding in the shop when Gunther and Raphael came in, but then went outside; while he was outside Green

4

and Chang each shot one of the men and put their bodies in their car; and Green then put the drugs in Taylor's car, but Chang now had them. (Tr. at 411, 415-18, 420-24, 428-32, 435.)

Once they arrived at the precinct in Yaphank, Detective McAlvin read petitioner his *Miranda* rights for the second time from the rights card he used in the car. (Tr. at 442-45, 786-90.) Taylor signed and initialed the rights card. (Tr. at 447-48, 470, 797, 801-06, 1199-1208.) Homicide detectives took an eight-page written statement from him, prefaced again by reading him his rights from the written form. Detective McAlvin wrote the written statement rather than petitioner because Taylor could only print; he also read the statement to Taylor as Taylor was a "slow reader." Petitioner waived his rights in writing and signed the written form, made corrections to the statement, initialed the corrections, and signed each page. (Tr. at 446-51.) While making his written statement Taylor twice changed his story. First, he admitted that he had been inside the building when the shooting took place, but maintained that Green and Chang had each shot one victim. He subsequently altered his story again when he admitted that he and Chang had each shot one of the men. (Tr. at 459-64.) Taylor then made sketches of the crime scene, signed them, and wrote on and signed crime scene photographs. (Tr. at 470-82, 824-31, 916-30.) Petitioner was asked to give a video statement. He chose not to do so and completed and signed a "Video Statement Refusal Form." (Tr. at 482-87.) At no point did Petitioner ask for an attorney. (Tr. at 752, 764-65, 789.) Throughout the day, he was fed and allowed to use the bathroom. (Tr. at 440-41, 784.) Nobody

5

hit, threatened, abused or became confrontational with Petitioner. (Tr. at 764, 778, 790-96, 821-22, 915-39.) The rights acknowledgment/waiver signed by Taylor, together with his statement, sketch, and video statement refusal form were all admitted into evidence. (Tr. 446, 472, 484-85.) The search of Taylor and his car revealed no evidence connecting him to the crime and a search warrant for Taylor's apartment was never sought. (Tr. at 537-59; 750-61.) No fingerprints from the vehicle in which the bodies were found or the body shop were identified as belonging to Taylor, Green, or Chang. (Tr. 51-63, 100-16.) The evidence at trial showed the following phone calls: on April 16, 1996 at 4:58 p.m., a 23-second call was made from the Chang apartment on Classon Avenue to Green's collision; on April 16, 1996, at 7:28 p.m., a 1-minute 39-second phone call was made from Green's Collision to Taylor's girlfriend, Jamelia Skyers; on April 17, 1996 at 6:36 a.m., a 9-second call was made from Chang's girlfriend, Nadeen Gayle, to Taylor's beeper; on April 17, 1996 at 6:43 a.m., a 5-second phone call was made from Taylor's girlfriend, Jamelia Skyers, to Chang's girlfriend, Nadeen Gayle; on April 17, 1996 at 6:59 a.m., a 1-minute 45-second call was made from Chang's girlfriend to Green's girlfriend; and on April 17, 1996 at 12:24 a 3-minute 53-second call was made from Taylor's girlfriend to Chang's girlfriend. (Tr. at 296, 305-311, 338, 376-77, 453, 455-56, 500.)

Taylor, together with Sterling Green ("Green") and Gairy Chang ("Chang"), was charged with the homicide of Gunther and Raphael. The statements each of the defendants gave to the police were the subject of a joint *Huntley* hearing held over

the course of six days. The trial court denied the defense motions to suppress the statements and ruled that any diagrams, marked photos, and related writing were similarly admissible. Chang, Green and Taylor were tried separately in September, October, and November/December 1997, respectively. Chang was acquitted after a jury trial. Green was found guilty of two counts of Felony Murder and sentenced to two concurrent terms of twenty-two years to life; his judgment of conviction was affirmed by the Appellate Division and the Court of Appeals denied leave to appeal.

Prior to jury selection for Taylor's trial, the admissibility of Green's statements was discussed. It was noted that in Chang's trial, his attorney consented and stipulated to the introduction of Chang's accomplices' statements. Taylor's counsel, however, objected to the admission of the statements. Then, shortly before opening statements, Taylor's attorney stipulated to the admission of Green's statements into evidence. The trial court proposed a limiting instruction similar to that used in the Chang trial and Taylor's counsel requested that the same instruction be given. (Tr. 3-6.) Green's two statements were admitted into evidence. (Tr. at 337, 370-71, 1348-49.) The trial court cautioned the jurors, both prior to the admission of the statements and during its jury charge, that the statements were:

> [N]ot being offered for the truth of what they say, okay? In fact, you will hear that Sterling Green gave these statements under circumstances suggesting he was trying to curry favor with the police department or shift suspicion of blame away from himself towards other people. The statements are being read to you with the consent of the attorneys solely to give you a chronology of the events as they unfolded during the investigation of this case, okay?

Tr. at 337, 370-71, 1348-49.

Taylor testified in his own behalf and maintained that he knew nothing about the murders. He had been to Green's for repairs to his car on four or five occasions, including April 16, 1996, but not April 17. When he was arrested on May 10, 1996, he did not know why. He stated that he was forced to sit naked while being questioned in the precinct. He denied signing or initialing the rights card although he was shown it at the precinct. He stated he has a problem with reading and claimed he did not understand the content of his confession and that he was still naked during its creation. He acknowledged that he signed the statement itself and initialed each rights waiver on the written statement and that he wrote on the sketch. He denied drawing the sketch and maintained that what he wrote was what Detective McAlvin told him to write, with McAlvin spelling the words for him. He said that he called in sick to his job at White Castle on April 17, 1996 and that he received a page on his pager from Chang at 6:36 a.m. that day. He then called Chang at his girlfriend's house and Chang asked him to come pick him up. He picked him up, brought him back to Brooklyn to his (Chang's) house and then was home by 11 a.m., where his mother and sister saw him. Neither before or on April 17, 1996 did he ever attempt to steal drugs or shoot anyone. (Tr. 1077-1169.)

## III.    Verdict and Post-Verdict Proceeding

Taylor was convicted by a jury of one count of Murder in the First Degree [N.Y. Penal Law §125.27(1)] and three counts[2] of Murder in the Second Degree [N.Y. Penal Law §125.25], Taylor was sentenced on January 21, 1998 to life without parole on the first count of Murder in the First Degree and three concurrent terms of 25 years to life on the three counts of Murder in the Second Degree.

On November 19, 2001, Taylor brought an application pursuant to New York Criminal Procedure Law §440.10 to vacate his judgment of conviction on the ground that he received ineffective assistance of counsel. More particularly, Taylor asserted that trial counsel was ineffective because (1) he consented to the admission of Green's confession; (2) he was drunk during many of the proceedings; (3) he failed to prepare Taylor to testify; and (4) he failed to recall the defendant and his wife to testify to "matters critical to the defense." (Pet.'s Appx. at 13.) The Supreme Court, Suffolk County (Mullen, J.), citing, *inter alia, Strickland v. Washington*, 466 U.S. 668 (1984), denied the motion in its entirety. (Pet.'s Appx. at 64-66.) The Appellate Division, Second Department denied petitioner's application for leave to appeal the denial of his § 440 petition by a Decision and Order dated June 9, 2003. (Pet.'s Appx. at 67.)

---

[2] The first count of murder in the second degree charged Taylor with intentionally causing the death of Raphael under N.Y. Penal Law § 125.25(1). The other two counts of murder in the second degree charged  him with causing the deaths of Raphael and Gunther during the course of a robbery under N.Y. Penal Law § 125.25(3).

Petitioner also appealed his conviction to the Appellate Division, Second Department, raising the following issues: (1) the evidence was insufficient to establish Murder in the First Degree and two counts[3] of Murder in the Second Degree; (2) his motion to suppress should have been granted; (3) the admission of the statements of Green and Chang[4] deprived him of his rights to confrontation, cross-examination and a fair trial; (4) errors in the court's charge to the jury; (5) his sentence was illegal and excessive; and (6) trial counsel was ineffective in that, inter alia, he stipulated to the admission of Green's and Chang's statements incriminating Taylor. (Pet.'s Appx. at 65-133.) By Decision & Order dated November 24, 2003, the Appellate Division vacated the conviction of murder in the first degree and the sentence imposed thereon. Otherwise affirming the judgment, the court found that the evidence "was legally sufficient to establish [Taylor's] guilt beyond a reasonable doubt," as to the two felony murder charges and that "[v]iewing the defense counsel's conduct in its entirety, [Taylor] was not deprived of the effective assistance of counsel," and that the remaining contentions were

---

[3] On appeal, Taylor argued, as he does here, that the evidence was insufficient to establish the two counts of murder in the second degree pursuant to N.Y. Penal Law § 125.25(3), i.e. felony murder, because marijuana is not property within the meaning of the New York Penal Law.

[4] Although the appeal, as well as the instant petition, refer to trial counsel's consent to the admission into evidence of Chang's statement, from this Court's review of the trial transcript and the list of trial exhibits, it appears that only the statements of Green were admitted at trial.

"without merit." *People v. Taylor*, 1 A.D.3d 619, 620 (2d Dept. 2003). The New York

Court of Appeals denied leave to appeal. *People v. Taylor*, 1 N.Y.3d 635 (2004).

## DISCUSSION

## I.     Legal Standard -  Habeas Corpus and the AEDPA

A federal court is empowered to "entertain an application for a writ of habeas

corpus on behalf of a person in custody pursuant to the judgment of a State court

only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254(b)(1). In order to obtain relief, an

individual in custody must demonstrate, inter alia, that he has: (1) exhausted all of

his State remedies; (2) asserted his claims in his State appeals such that they are

not procedurally barred from federal habeas review; and (3) if his appeals were

decided on the merits, overcome the deferential standard of review set forth in the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Philbert v.

Brown*, 2012 WL 4849011, at *5 (E.D.N.Y. Oct. 11, 2012)**.**

### A.     AEDPA Deference Standard

Under the AEDPA, a writ of habeas corpus shall not be granted on a claim

that was "adjudicated on the merits" in the state court unless that state court's

decision was "was contrary to," or involved an "unreasonable application" of "clearly

established Federal Law" as determined by the United States Supreme Court or

"was based on an unreasonable determination of the facts" in light of the evidence

presented to the state court. 28 U.S.C. § 2254 (d); *Thaler v. Haynes*, 559 U.S. 43, 47

(2010). "A state court adjudicates a petitioner's federal constitutional claims on the

merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the [United States] Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a United States Supreme Court case, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (internal quotation marks and citations omitted). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (internal quotation marks and citation omitted).

Under the AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (internal quotation marks omitted). As recently reiterated by the Supreme Court, "[a] state court's determination that a

claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. . . . The state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, – S. Ct. –, 2016 WL 1278478, *2 (Apr. 4, 2016) (internal quotation marks and internal citations omitted).

Moreover, when the claim for relief is based on ineffective assistance of counsel "AEDPA review is doubly deferential . . . because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . . . In such circumstances, federal courts are to afford both the state court and the defense attorney the benefit of the doubt." *Id.* (internal quotation marks and internal citations omitted).

### B.     Exhaustion

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). The Supreme Court has held:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional

> issues by invoking one complete round of the State's
> established appellate review process.

*O'Sullivan*, 526 U.S. at 845; *accord Smith v. Duncan*, 411 F.3d 340, 347 (2d Cir. 2005). Thus, a petitioner is required to have presented each claim to all available levels of the state courts. *See, e.g., Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("[T]he prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review.")) (citations and internal quotation marks omitted). The petitioner must also have fairly presented the "federal nature" of each claim to the state courts. *Id.; Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam); *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005).

## II. Discussion of the Asserted Grounds for Relief

Petitioner's claims having been appropriately exhausted, the grounds advanced by him will now be addressed.

## A. Insufficient Evidence Claim

Taylor contends that he was deprived of his due process rights because the evidence was legally insufficient to convict him of the two counts of second degree (felony) murder pursuant to N.Y. Penal Law § 125.25(3). (Pet.'s Br. at 9.) Specifically, he argues that the evidence at trial was legally insufficient to establish the predicate crime for that charge, *viz.* robbery, because the marijuana alleged to have been stolen is not "property" within the meaning of the New York Penal Law. (*Id.*)

The standard for granting habeas corpus relief from a state court conviction based on insufficient evidence is well established. "[A] petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Policano v. Herbert*, 507 F.3d 111, 116 (2d Cir. 2007) (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000)); *see Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir. 1995). Accordingly, "in a challenge to a state criminal conviction under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Policano*, 507 F.3d at 115-16 (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)); *see People v. Contes*, 60 N.Y.2d 620 (1983) (stating the standard for review of the legal sufficiency of evidence in a criminal case is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (quoting *Jackson*, 443 U.S. at 319).

A federal court reviewing a state prisoner's habeas corpus petition based on a claim of insufficiency of the evidence must look to state law to determine the elements of the offense at issue. *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)). However, a federal habeas court "does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the

United States." *Ponnapula*, 297 F.3d at 182; *see Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Furthermore, not every state law error "can be transmogrified by artful argumentation into a constitutional violation." *Ponnapula*, 297 F.3d at 182.

The pertinent elements of second degree felony murder in New York state are that in the furtherance of a felony - here robbery - "defendant, or another participant, if there be any, causes the death of a person other than one of the participants." N.Y. Penal Law § 125.25(3). New York defines "robbery" as a "forcible stealing" that occurs when, "in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person." N.Y. Penal Law § 160.00. A "larceny" occurs when, "with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." *See* N.Y. Penal Law § 155.05(1). "Property" is defined as "any money, personal property, real property, computer data, computer program, thing in action, evidence of debt or contract, *or any article, substance or thing of value*, including any gas, steam, water or electricity, which is provided for a charge or compensation." N.Y. Penal Law § 155.00(1) (emphasis added). Finally, "owner" is defined as "any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." N.Y. Penal Law § 155.05(5).

Pointing to the fact that it is unlawful to possess marijuana in New York, *see* N.Y. Penal Law § 220-21, Taylor contends that marijuana cannot be considered "property" within the meaning of the New York robbery statute as a person cannot have a superior right of possession to something that is illegal to possess. (Pet.'s Br. at 18.)

Taylor's argument fails to acknowledge that a federal habeas corpus court may not correct a supposed misapplication of state law unless the misapplication violates the United States Constitution or federal law. *Ponnapula*, 297 F.3d at 182. He does not contend that the alleged misapplication of state law was also a misapplication of federal law. Even if he had asserted this argument, however, it would not have helped his insufficient evidence claim. Courts in this Circuit have rejected the argument that illegal drugs cannot be considered property within the meaning of the Hobbs Act, 18 U.S.C. § 1951.[5] *See U.S. v. Borrero*, 2014 WL 1918607, *1 (S.D.N.Y. May 12, 2014); *United States v. Thompson*, 2006 WL 1738227, at *2 (S.D.N.Y. June 23, 2006): *see also United States v. Gotti*, 459 F.3d 296, 325–26 (2d Cir.2006) (stating that it would be "untenable" to hold that one can never extort, under the Hobbs Act, illegal property because such property can never

---

[5]     The Hobbs Act states, in relevant part, that: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951.  Furthermore, the Act defines robbery as the "unlawful taking or obtaining of personal property." *Id.*

be legally sold or transferred); *see also United States v. Cortes*, 757 F.3d 850, 865 (9th Cir. 2014) (rejecting the argument that Hobbs Act robbery is limited to the stealing of lawful property and excludes contraband such as illegal drugs); *see generally United States v. Taylor*, – U.S. – . 136 S. Ct. 2074, (holding that to obtain a conviction under the Hobbs Act for the robbery or attempted robbery of a drug dealer, the government need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines; it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds). Based on the foregoing precedents indicating that federal robbery charges may be premised on the theft of illegal drugs, Petitioner cannot claim that the New York Courts have misapplied federal law.

Although Petitioner is dissatisfied with New York's interpretation and application of the statutes that pertain to his felony murder convictions, it is not this Court's province to fix these alleged errors. In any event, New York precedent indicates that marijuana is considered property for the purpose of robbery convictions. *See, e.g.*, *People v. Young*, 902 N.Y.S.2d 222 (3d Dept. 2010) (finding defendant guilty of eight counts of robbery in the second degree for stealing money and marijuana); *People v. Johnson*, 564 N.Y.S.2d 366 (1st Dept. 1991) (felony murder and robbery charges premised on robbery of marijuana); *People v. Clark*, 729 N.Y.S.2d 88 (1st Dept. 2001) (second degree felony murder based on robbery of marijuana and guns); *cf. People v. Colasanti*, 35 N.Y.2d 434, 436-37 (1974)

(determining that it is immaterial whether the value of illegal drugs is derived from a legitimate or illegitimate market as "courts have found that the underworld value of contraband may be used in determining value for the purposes of a larceny or criminal possession statute" and "[a] contrary view would be intolerable, if only because it would immunize a thief or receiver from prosecution for the higher degree of crime because he specialized in stolen goods which had no value in a legitimate market." ).

Here, it would be illogical to allow Taylor to avoid prosecution for felony murder simply because he stole marijuana from the victims, rather than a legal item of value. Moreover, it is clear that marijuana has a street value. In fact, according to Taylor's confession he planned to sell the stolen marijuana in smaller packages after the robbery. (Tr. at 466-67.)

Finally, the Appellate Division, Second Department's conclusion that Petitioner's insufficient evidence claim is without merit, is entitled to deference under the AEDPA.

In conclusion, Taylor's claim of insufficient evidence provides no basis for habeas relief.

**B.    Ineffective Assistance of Counsel**

Petitioner contends that he was denied effective assistance of counsel at trial for four reasons. First, counsel consented to the admission of Green's statements in violation of *People v. Bruton*, 391 U.S. 123 (1968) and pursued this strategy because

he incorrectly believed he was building reversible error into the record.[6] Second, he was inebriated during proceedings. Third, he failed to prepare Taylor to testify. Lastly, he failed to recall the defendant and his wife to testify to "matters critical to the defense." (Pet.'s Br. at 12-13.)

1. Legal Standard

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the assistance of Counsel for his defense." U.S. Const. amend. VI.

In order to prevail on a Sixth Amendment claim, a petitioner must prove that

(a)     counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and

(b)     "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

---

[6] In *Bruton*, the Supreme Court held that the admission of a co-defendant's confession that implicated the defendant at a joint trial constituted prejudicial error even though trial court clearly instructed the jury that the confession could only be used against the co-defendant and must be disregarded with respect to the defendant.  *Bruton*, 391 U.S. at 135-36. *Bruton* is inapplicable here, however, as trial counsel consented to the admission of Green's statements as part of a coherent trial strategy, as discussed *infra. See generally, United States v. Yu-Leung*, 51 F.3d 1116 (2d Cir. 1995) (strategic choice not to object to admission of evidence waives right to appeal admission).

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case viewed as of the time of counsel's conduct, . . . and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528 (2d Cir. 1994) (internal quotation marks and citations omitted).

Second guessing the tactical and strategic choices made by counsel is seldom appropriate. "Courts in this district have routinely refused to find ineffective assistance of counsel given the wide range of conduct considered reasonable." *Occhione v. Carpa*, – F. Supp. 3d –, 2015 WL 3879534 (E.D.N.Y. 2015) (citing *Melendez v. Heath*, 2014 WL 2440499, at *5 (E.D.N.Y. May 30, 2014); *Gordon v. Bradt*, 2014 WL 1237370, at *8 (E.D.N.Y. Mar. 25, 2014); *Garcia v. Smith*, 2014 WL 905544, at *20–21 (E.D.N.Y. Mar. 7, 2014); *Johnson v. Taylor*, 2010 WL 2735770, at *4–6 (E.D.N.Y. July 8, 2010).) "If counsel was actively engaged . . . in various aspects of a defense, ineffective assistance is rarely found." *Occhione*, 2015 WL 3879534 at *15; *see Caimite v. Fischer*, 2009 WL 236917, at *5–6 (E.D.N.Y. Feb. 2, 2009) (trial counsel that engaged in pretrial discovery, effectively cross-examined witnesses, made cogent opening, appropriate objections and motions during trial, and made appropriate charge requests and sound closing arguments considered effective).

In addition, as the state courts rejected Taylor's claims of ineffective assistance of counsel on the merits, "AEDPA review is doubly deferential . . . . In such circumstances, federal courts are to afford both the state court and the defense attorney the benefit of the doubt." *Woods,* – S. Ct. –, 2016 WL 1278478, *2 (internal quotation marks and internal citations omitted).[7] "[A]s a result of the interaction between the AEDPA and *Strickland*, the question before [the Court] . . . becomes whether there is any reasonable argument that [Taylor's] counsel satisfied *Strickland's* deferential standard . . . ." *Chrysler v. Guiney,* 806 F.3d 104, 118 (2d Cir. 2015) (internal quotation marks omitted).

With these precepts in mind, the Court will address the ground advanced seriatim.

2.    <u>Consenting to the Admission of Green's Statements</u>[8]

Taylor's contention that counsel's chosen trial strategy could not have helped him under any circumstances is without merit. When his trial commenced in November 1997, the defense knew that two months earlier co-defendant Chang's

---

[7] The Second Circuit has held that New York's meaningful representation standard is not contrary to the *Strickland* standard. *E.g. Rosario v. Ercole*, 601 F.3d 118, 124-127 (2d Cir. 2010), and has recognized that the New York Court of Appeals views the New York standard as more generous to defendants than *Strickland*.

[8] As noted earlier, although the petition refers to trial counsel's consent to the admission into evidence of Chang's statement as support for the claim of ineffective assistance of counsel, from the Court's review of the trial transcript and the list of trial exhibits, it appears that only the statements of Green were admitted at trial. Regardless, the admission of another co-defendant's statement would not alter the analysis herein.

trial had ended in an acquittal. Taylor and his attorney were both aware that Chang's attorney stipulated to the admission of Green's statements, and that Chang was reportedly acquitted because the jury disbelieved Chang's confession and discredited police testimony. It is also important to note that the same Assistant District Attorney, Matthew Parella and trial judge, Michael F. Mullen, participated in Chang's trial. The decision to pursue the same strategy that had prevailed in Chang's trial, based on knowledge of Chang's acquittal, was reasonable.

Nothing in the record indicates that trial counsel's adoption of this strategy was based on his misapprehension of law as alleged by Taylor. Although he alleges that trial counsel believed he was building reversible error into the case by consenting to the admission of Green's confession, he cites only to a conversation that appellate counsel had with his trial counsel, not the trial record. (Pet.'s Br. in Supp. at 14-15.) This unsubstantiated allegation contradicts the trial record's depiction of defense counsel's performance. The case against Petitioner was based in large part on his oral and written statements, sketches, and other markings on photographs. Therefore, counsel's consent to the introduction of Green's statements at trial was an important part of his strategy to discredit those pieces of evidence. Part of counsel's strategy was to impugn the credibility of Detective McAlvin and other police officers as it pertained to Petitioner's incriminating statements and markings on photographs and diagrams. Counsel endeavored to illustrate that the statements of Chang, Green and Petitioner were suspiciously similar, and therefore, probably fabricated by the police. Furthermore, counsel attacked Green's

statements line by line, (Tr. at 715-34), and pointed out that Chang, Green and Petitioner each made oral and written statements but then declined to give video statements, noting it was "strange, three different people and the same scenario." (Tr. at 852.) Counsel questioned Detective McAlvin about each of the three co-defendants giving "the exact wording for each of the guys as to what they did." (Tr. at 850-54.) Counsel's questioning of witnesses also raised the specter that Green implicated Taylor in order to divert suspicion from his father and brothers who were the real participants in the robbery/murder. (*See, e.g.,* Tr. at 603-04, 620-21, 653-56.) Counsel's strategy to demonstrate that all of the co-defendants' statements were suspicious and thereby cast doubt on Petitioner's particularly harmful admissions was a reasonable one.

Moreover, trial counsel did not ignorantly consent to the admission of Green's statements, rather, he initially objected to the admission of the statements. He also requested a limiting instruction similar to that used in the Chang trial, viz. that "[t]hey are being entered not for the truthfulness of the statement, but to show a sequence of events." (Tr. at 6.) The trial court cautioned the jurors—both prior to the admission of the statements and during the charge to the jury at the conclusion of the trial—that the statements were:

> [N]ot being offered for the truth of what they say, okay?
> In fact, you will hear that Sterling Green gave these
> statements under circumstances suggesting he was trying
> to curry favor with the police department or shift
> suspicion of blame away from himself towards other
> people. The statements are being read to you with the

> consent of the attorneys solely to give you a chronology of
> the events.

(Tr. at 337, 370-71, 1348-49.)[9]  The record indicates that by consenting to the

admission of Green's statements, counsel was trying to show a sequence of events

whereby Green attempted to draw the police's attention away from him and his

family and onto Chang and Taylor and to discredit the admissions made by his

client.  (*See*, *e.g.*, Tr. at 1234-42.) Counsel pursued this strategy—attempting to

impugn the credibility of Detective McAlvin and the statements he elicited from

Petitioner and his codefendants—consistently throughout the trial, particularly

during his cross-examination of the lead detective and in his closing argument.

Taylor has failed to demonstrate that trial counsel's performance fell below

an objective standard of reasonableness. As the Supreme Court has aptly put it,

"[t]here are countless ways to provide effective assistance in any given case. Even

the best criminal defense attorneys would not defend a particular client in the same

way." *Strickland*. 466 U.S. at 689.  Trial counsel pursued a deliberate, coherent

strategy, exhaustively cross-examined Detective McAlvin, cross-examined all of the

People's witnesses, and called several defense witnesses.  Counsel also represented

Petitioner during the six-day suppression hearings in June 1997, and filed motions

---

[9] The Court notes that, contrary to petitioner's assertion, the prosecution did not argue the truthfulness of Green's statements. *See* Tr. at 1262 ("I don't want you to use it and say this man is guilty because of Sterling Green's statements, although I would note no where in there does it name Robert Taylor."); *id.* at 1322 (referring to Green's statement, "I'm not suggesting you take this as true because Sterling Green is holding back too . . . .").

and discovery requests prior to trial.  As Judge Mullen succinctly stated in his Decision and Order denying Petitioner's Motion to Vacate:

> [Counsel] presented an effective defense.  He conferenced the case, filed motions, made discovery requests, conducted pre-trial hearings, cross-examined witnesses, objected to the introduction of certain evidence and consented to the admission of other evidence.  His summation was excellent. In sum, he maintained a trial strategy (similar to that of a co-defendant), consistent with the evidence and facts of the case.  That it was unsuccessful does not mean it was ineffective.

Pet.'s App. at 66.

Even, assuming *arguendo*, the challenged conduct of counsel was unreasonable, Taylor has not demonstrated prejudice, which is the second prong under *Strickland* and necessary to set aside his conviction. Sufficient prejudice exists when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In the case at bar there is no reasonable probability that the outcome of Petitioner's trial would have been different but for defense counsel's performance. Petitioner confessed to the crime and signed and initialed his confessions.  He later made corrections to the written statement and signed those corrections.  He drew sketches of the crime scene and also wrote on crime scene photographs. Evidence produced at trial indicated that Petitioner, Chang and Green exchanged telephone calls at times relevant to the murder and Petitioner possessed a receipt indicating that he purchased Ziploc bags on the day of the robbery/murder only hours thereafter, which he later admitted were to be used for bagging the marijuana.

Based on the foregoing, the Court cannot say that the state court's rejection of Taylor's claim that his counsel's consent to the admission of Green's statements constituted ineffective assistance of counsel is either contrary to or an unreasonable application of clearly established federal law.

3.    The Inebriation Claim

The only evidence that counsel was drunk during the trial or that his performance was impaired by alcohol is petitioner's affidavit executed nearly five years after the trial. Petitioner's assertion is unsupported by reference to any actions or statements during the trial that suggest counsel was inebriated. Moreover, Justice Mullen, who was the trial judge, stated in denying petitioner's motion pursuant to CPL § 440.10:

> [N]o evidence has been presented to substantiate that claim, absent an affidavit by [Taylor] which, even if taken as true, fails to establish that defense counsel was intoxicated in Court or while preparing the case. In opposition the People have provided an affirmation from the trial prosecutor (now an Assistant United States Attorney), which, in substance, indicates that during the conferences, pre-trial hearings, trial and sentencing, he never had any reason to believe that defense counsel was under the influence of drugs or alcohol.
> The same is true of the Court. There is no way the Court would have allowed trial counsel in a murder case to continue if there was even the slightest hint that he was impaired in any way by alcohol or drugs. There was simply no evidence whatsoever to support the spurious claim defendant now makes.

Pet.'s App. at 65.

The state court having found that the claim of inebriation was meritless, this Court cannot say that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods*, – S. Ct. –, 2016 WL 1278478, at *2. Indeed, given that neither the prosecutor nor the trial judge "had the slightest hint" trial counsel was impaired and there nothing on the record to so indicate, a fair-minded jurist could certainly conclude that the claim of inebriation was without merit. *Cf. Friedgood v. Keane*, 51 F. Supp. 327, (E.D.N.Y. 1999) (rejecting claim of ineffective assistance based on counsel's alleged drinking where "record discloses no incapacity on counsel's part resulting from his alleged drinking, or any concern expressed by the court with regard to counsel's condition;" and "petitioner neither replaced his counsel, indicated dissatisfaction with this counsel to the court, [nor] cited a single instance where the alleged drinking and illness affected counsel's performance.")

4.    The Failure to Prepare Taylor to Testify

Petitioner's argument that trial counsel failed to prepare him to testify resulting in inadequate testimony is unsupported by the record. There is nothing to indicate that counsel failed to properly prepare Taylor. Taylor's direct testimony was cogent and comprehensive. Neither the prosecution's effective cross-examination of Taylor or Taylor's ultimate conviction support the conclusion that counsel did not properly prepare him.

5.    The Decision Not to Recall Taylor and His Wife

One aspect of Taylor's defense was that he was deficient in reading, writing, speaking and understanding English, and these deficiencies prevented him from understanding or waiving his *Miranda* rights or making his alleged confession. In response, the prosecution called Maria St. Bernard as a rebuttal witness. St. Bernard testified that she hired Taylor on March 12, 1996 to work at White Castle after she interviewed him and that he filled out and signed various forms in her presence. According to St. Bernard, Taylor understood English; she made him read White Castle's policy form out loud to make sure he  fully understood what was expected of him and did not have to read any form to him. She admitted the forms were not difficult and that Taylor omitted some of the information that was requested but denied anyone was prompting him when he read the forms. She also testified that Taylor was supposed to work on April 16, 1996, but an unknown female called and said he was sick. He called himself on April 17 to say he would not be in. (Tr. 1181-98.) Despite an alleged offer of Taylor and his fiancee to testify that she, not Taylor, filled out the application, counsel did not recall them.

Both the Appellate Division on appeal and Justice Mullen on the CPL §440 motion rejected this claim. Given the deference required under the AEDPA, this Court cannot say that the tactical decision not to recall Taylor and his wife constitutes ineffective assistance of counsel. Taylor had already testified to his inability to read and his fiancee was an interested party. Moreover, on cross-examination, the White Castle witness was adamant that Taylor filled out the

29

application himself and was not prompted by anyone and that he was able to read one of the forms out loud to her.

      6.    <u>Miscellaneous Claims of Ineffective Assistance of Counsel</u>

Petitioner asserts a variety of other claimed instances which he argues demonstrates that trial counsel was ineffective. These instance run the gamut from motions containing the wrong indictment number, to misstating the date of petitioner's arrest, to failing to object to certain question and failing to ask questions.

The Supreme Court has explained that: "the type of breakdown in the adversarial process that implicates the Sixth Amendment is not limited to counsel's performance as a whole - specific errors and omissions may be the focus of a claim of ineffective assistance as well." *United States v. Cronic*, 466 U.S. 648, 657 n.20, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). A single or "isolated error of counsel if that error is sufficiently egregious and prejudicial" may constitute ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). In cases where there are individual acts or omissions which do not amount to ineffective assistance by themselves, "the cumulative weight of error" may be substantial enough to meet the *Strickland* test. *See Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001).

Taylor has not demonstrated either a single egregious error or omission amounting to ineffective assistance of counsel, or a series of errors that, in the aggregate, amount to ineffective assistance. Trial counsel's consent to the

admission of statements made by a non-testifying co-defendant was part of a deliberate strategy, not an egregious error. Moreover, the asserted instances neither individually nor collectively provide a basis for relief. Counsel's actions must be viewed on the basis of the facts of this particular case and as of the time of counsel's conduct. Here, counsel made appropriate pre-trial motions, sought and conducted pre-trial hearing, made discovery requests, vigorously cross-examined the prosecution's witnesses, presented defense witnesses, maintained a trial strategy consistent with the evidence, and made cogent arguments during his closing. *Cf. Caimite,* 2009 WL 236917, at *5–6 (trial counsel that engaged in pretrial discovery, effectively cross-examined witnesses, made cogent opening, appropriate objections and motions during trial, and made appropriate charge requests and sound closing arguments considered effective). Moreover, there is no reasonable probability that but for counsel's performance, the outcome of Taylor's trial would have been different given that he confessed to the crime and that his written statement to the police contained a number of details that were not confirmed by the police until months after his arrest. *(See, e.g.*, Tr. at 425-26; 503-04.)

The state court's determination that counsel's performance did not deprive Taylor of effective assistance of counsel is neither contrary to nor an unreasonable application of federal law.

## CONCLUSION

Having considered all of Taylor's arguments, the petition pursuant to
28 U.S.C. § 2254 is denied. Additionally, no certificate of appealability will issue
because Taylor has failed to make a substantial showing of the denial of a
constitutional right as required by U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated:   Central Islip, New York
         September 30, 2016                    /s/  Denis R. Hurley
                                               Denis R. Hurley
                                               United States District Judge